11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Weston
Lloyd Carthen

Appellant

Vs.                   No. 11-04-00151-CR -- Appeal
from Palo Pinto County

State
of Texas

Appellee

 

Weston Lloyd Carthen appeals his conviction by a
jury of the offense of manufacturing a controlled substance, methamphetamine,
in an amount of 400 grams or more.  The
jury assessed his punishment at 65 years in the Texas Department of Criminal
Justice, Institutional Division, and a fine of $10,000.  In two issues, Carthen asserts that the
evidence is legally and factually insufficient to support the determination
that he engaged in the manufacture of a controlled substance and that the trial
court=s actions
during trial are indicative of bias resulting in the denial of his right to an
impartial tribunal.  We affirm.

Carthen contends in Issue One that the evidence is
legally and factually insufficient to support the determination that he engaged
in the manufacture of a controlled substance. 
In a legal sufficiency review, we view all of the evidence in the light
most favorable to the verdict and then determine whether a rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307 (1979).  In a factual
sufficiency review, we view all of the evidence in a neutral light; and we will
set the verdict aside only if the evidence is so weak that the verdict is
clearly wrong and manifestly unjust or if the contrary evidence is so strong
that the standard of proof beyond a reasonable doubt could not have been met.  Zuniga v. State, 144 S.W.3d 477
(Tex.Cr.App.2004).








Freddie Gonzales testified that he is a constable
for Palo Pinto County.  He indicated that
on April 3, 2003, having previously served an eviction notice on Carthen, he
went to Carthen=s
residence at 305 Tournament to see how far along he was to moving out.  He stated that it took Carthen about a couple
of minutes to get to the door.  He said
that he detected the smell of ether, which he knew to be a method of Acooking@
methamphetamine.

Constable Gonzales testified that, after stepping
inside the residence, he noticed some containers against the east wall of the
living room.  He indicated that there was
a red water cooler in the living room floor. 
He said it appeared that no furniture had been moved out.  He stated that Carthen said, AWe=re
moving, we=re
putting our stuff out.@

Constable Gonzales related that, after he could
not secure backup at that time, he left and returned to the residence with
another officer about 45 minutes to one hour later.  He testified that, after calling the sheriff=s office for assistance, Deputy
McCurtain came to the residence.  He
stated that, when they tried to open one of the containers in the residence, it
started spewing because it was under pressure.

Constable Gonzales testified that Carthen was at
the residence and occupied the residence. 
He said that, based upon what he saw in the residence, he had no doubt
that Carthen was manufacturing methamphetamine.

Doug Wood testified that he is a lieutenant in the
Narcotics Service of the Texas Department of Public Safety.  He indicated that on April 3, 2003, he was
involved in an investigation of the manufacture of methamphetamine at 305
Tournament.  He identified Carthen as the
person who occupied the residence.  He
related that, when he arrived at the residence on that evening, it appeared
that there was an eviction going on because there was a lot of property in the
front yard.  He said that he could mostly
smell the odor of ether at that location. 
According to Lieutenant Wood, that odor meant that somebody had been
manufacturing methamphetamine at that location.

Lieutenant Wood testified that pump-up sprayers
found at the residence were an indication of the manufacturing process.  He asserted that they were used as a
generator of hydrochloric gas.  He named
the two ingredients that are put into such sprayers to produce the gas.  He also cited coffee filters, buckets, Drano
(a drain opener), and a sprayer mask as further examples of items used in
manufacturing methamphetamine.








Lieutenant Wood then elaborated on the ingredients
and the process by which methamphetamine is manufactured.  While we feel that it would be imprudent to
detail the manufacturing process here, it appears to involve a combination of
extraction and chemical synthesis because it involves a combination of
chemicals, from which certain resulting chemicals are extracted to produce the
methamphetamine.  Lieutenant Wood
testified that there was no doubt in his mind that the process of manufacturing
methamphetamine by a combination of extraction and chemical synthesis had taken
place at the residence.  

On cross-examination, Lieutenant Wood confirmed
that a brown substance in the water cooler was found to contain
methamphetamine.  Lieutenant Wood
acknowledged that he did not see any ammonia or ammonia containers and that he
could not remember if there were any lithium batteries.  Ammonia and lithium batteries were two of the
ingredients he had earlier mentioned as those used in the manufacturing
process.  Acknowledging that
manufacturers of methamphetamine use starter fluid in the process, he stated
that he did not find any containers of such fluid.  He also acknowledged that he did not see any Abones,@
a sludge-type substance that results at a certain stage of the manufacturing
process.  He said that he did not see
Carthen on this occasion.

Darla Dowell testified that she is employed in the
Narcotics Service of the Texas Department of Public Safety.  She indicated that she became involved in the
investigation at 305 Tournament in Mineral Wells on April 3, 2003.  She said that, when she arrived at the scene,
she saw things consistent with a methamphetamine lab.  She identified several common items found at
the scene and testified concerning their use in the process of manufacturing
methamphetamine.  One of the items
mentioned was pseudoephedrine tablets, which she identified as an ingredient in
the manufacture of methamphetamine.  She
testified that the liquid tested by the Department of Public Safety laboratory
contained over three kilograms of methamphetamine.  Officer Dowell ac-knowledged that she found
no evidence of lithium batteries or any evidence of ammonia.  She also said that she did not find any
containers with ether or starter fluid in them. 
Officer Dowell also elaborated on the manufacturing process.








William Chandley testified that he is a forensic
chemist with the Texas Department of Public Safety crime laboratory in
Abilene.  He testified that the liquid
provided to him from Officer Dowell that she identified as coming from the
residence weighed 3.01 kilograms.  He
said that he performed a litmus test that indicated Ait=s probably the anhydrous ammonia
lithium process for reducing pseudoephedrine to methamphetamine.@ 
He indicated that, after testing the material, he formed an opinion that
the substance contained methamphetamine. 
He confirmed that 3.01 kilograms weighs more than 400 grams.  He also confirmed that the contents of the
liquid were consistent with being used in the process of manufacturing a
controlled substance by a combination of extraction and chemical synthesis.

Carthen testified that he formerly lived at the
residence at 305 Tournament.  He said
that he first lived there with his mother and little brother Ricky Lance
Carthen.  He indicated that his mother
was no longer there in November 2002.  He
stated that he lived there until mid-March of 2003 but moved out because he
wanted to change his lifestyle and straighten out his life.  He insisted that Ricky was using a little bit
of drugs but was not involved in it like he was.  Carthen acknowledged giving statements to
Officer Dowell and Officer John Waigt.

Carthen testified that, after moving out, he
stayed at his ex-wife=s
house and then at a friend=s
house for a couple of days before moving in with his girlfriend Alethia.  He indicated that he had moved everything
from the residence on Tournament that he wanted to keep.  He insisted that he had not lived in or been
in the residence for two weeks.  He
acknowledged that he had admitted to Officers Dowell and Waigt that he had
manufactured drugs in the past, but he insisted that he did not manufacture the
drugs that were found in the Tournament Lane residence.  He said that he had never seen the brown
liquid that was identified in court as containing methamphetamine nor had he
noticed the red cooler sitting in the house on the day in question.  He said that he was at the residence that day
just picking up odds and ends, things he wanted to keep.  Based upon his experience in manufacturing
methamphetamine, Carthen indicated that powdered-out methamphetamine could not
be produced from the brown liquid.  He
said that the house was unlocked most of the time and that a so-called friend
or acquaintance had a key.  He said that
his friend used to cook dope.

Carthen denied smelling any ether when Constable
Gonzales came to the house.  He indicated
that he did not remember seeing the canisters along the wall or the red one in
the middle of the room.  He insisted that
the pseudoephedrine tablets Officer Dowell had found were not usable for
manufacturing methamphetamine because they contained acetaminophen and were not
just pseudoephedrine hydrochloride.  He
acknowledged, in a written statement he gave on May 28, 2003, that he said that
the last cook he had done was Atwo
weeks ago.@  He insisted that he should have said Atwo months.@








Brandy Brock, Carthen=s
ex-wife, testified that Carthen came and stayed with her and her family in
April 2003.  She said that he talked
about changing his life.  She denied that
Carthen went anywhere between April 1 and April 4, other than her house and a
house at a location other than Tournament Lane. 

Considering all of the evidence, we hold that the
evidence is legally and factually sufficient to support Carthen=s conviction for manufacturing
methamphetamine.  See Gish v. State,
606 S.W.2d 883, 886-87 (Tex.Cr.App.1980); Lindley v. State, 736 S.W.2d
267, 273 (Tex.App. - Fort Worth 1987, pet=n
ref=d untimely filed).  Carthen argues that the evidence is
insufficient to show that he manufactured the methamphetamine contained in the
brown liquid found at his residence or that he manufactured it by extraction or
chemical synthesis.  We note that on
April 3, 2003, there was a smell of ether at Carthen=s
residence, which witnesses indicated was part of the process of manufacturing
methamphetamine.  Witnesses expressed
their opinion that the manufacturing of methamphetamine was occurring at the
residence.  At least two witnesses
testified that the manufacturing of methamphetamine occurring was by a
combination of extraction and chemical synthesis.  Carthen admitted to manufacturing
methamphetamine numerous times, including one time after he had supposedly
cleaned up his life.  Although Carthen
denied that he manufactured the methamphetamine that was in his presence at his
residence on April 3, 2003, or even that he was residing where the drug was
found, the jury was free to disbelieve his testimony.








Carthen suggests that the evidence is insufficient
because it merely shows his presence at a drug laboratory, citing the case of Green
v. State, 930 S.W.2d 655, 657 (Tex.App. - Fort Worth 1996, pet=n ref=d).  As stated in Green, although an
accused=s mere
presence at the scene of a drug laboratory is insufficient to support a
conviction for drug manufacturing, it is a circumstance tending to prove guilt
that, when combined with other facts, shows that the accused was a participant
in the manufacturing.  Id.  In this case, the fact that the drug
laboratory was on Carthen=s
premises and the fact that he was present there at a time when there was a smell
of ether as well as the other facts noted above are sufficient to establish
Carthen=s
guilt.  We do not find Green to be
inconsistent with our opinion.  While
Carthen urges that the evidence is uncontroverted that he had not been to the
property for a long time and had returned only briefly to gather his belongings
and leave, the jury was not required to believe his testimony.  There was other evidence from which a
reasonable juror could have determined that Carthen was in possession and
control of the premises, that he still resided there, and that he was involved
in the manufacture of the methamphetamine found at that location.  Carthen suggests that his possession of the
water cooler containing the methamphetamine that had been manufactured was not
sufficient by itself to support his conviction. 
He presents no authority for that suggestion.  Even if that were true, like his presence at
a drug laboratory, it is certainly a circumstance that, when considered with
the other evidence, is indicative of his guilt. 
We overrule Issue One.

Carthen urges in Issue Two that the trial court=s actions during trial are indicative
of bias so that he has been denied his due process right to an impartial
trial.  In view of the fact that he gives
us no example of anything the trial court said or did that could be considered
indicative of bias, we overrule Issue Two.

The judgment is affirmed.

 

PER CURIAM

 

August 18, 2005

Do not publish.  See
TEX.R.APP.P. 47.2(b).

Panel
consists of: Wright, J., and

McCall,
J., and Hill, J.[1]











[1]John G. Hill, Former Chief Justice, Court of Appeals,
2nd District of Texas at Fort Worth sitting by assignment.